Alexander Good morning, Mr. Kluge. Good morning, Your Honor. Good morning. May it please the Court. The Court's ready. Should I proceed? Please. This case, like many criminal cases, raises the question of sufficiency of the evidence. The additional important factor in this case is that the first question is whether there was a crime committed at all. And that's because the sole count of conviction in this case, under 18 U.S.C. 1035, has certain very specific and narrowing elements that the government believed it had charged in the indictment that it didn't prove out at trial at all. The government had charged in the indictment. Is this an argument? You make two arguments. You say the indictment is facially and legally insufficient and you say, in addition, even if it's facially sufficient, the proofs were factually insufficient to prove the crime. So are you going to the first, the second, or both? I'm going straight to sufficiency because I think... Factual sufficiency of the evidence. Yes. Okay. Thank you. The indictment charged and so the government was obligated to prove what it charged that an 855S form by CMS, which has a name of enrollment application but is used for all sorts of different purposes. It's more like a transformer form. It transforms to very small purposes, to very small components, or it expands to larger components. The indictment charged that this form required the applicant, an applicant, to include ownership information and that this ownership information then was material to a decision of whether or not to permit the applicant to enroll in Medicare. The evidence turned out, none of that was true in this case. I thought there was an expert witness who testified that false ownership information would lead to enrollment termination. He did not testify. Why isn't that enough to meet the materiality requirement? He actually did not go that far. What he said was that if Medicare were to determine that enrollment information is erroneous, that there was a potential down the road for some form of action by Medicare. Enrollment termination? Many other possibilities. There was a potential, a possibility. Of course, that is not the test for materiality under Gowden. The court in this case made it clear that this witness's testimony cannot override the law in any way. Most importantly, when the witness gave that testimony, he was talking about full enrollment applications. It was not until several witnesses later that the government called another witness, Kelly Wolf, who explained this application, which is that this application limits what is required on the form. This form, it's explicit and it says you have to, quote, disclose any person having ownership, financial, or controlled interest in the supplier. That you have to include that in order to obtain billing privileges. That is absolutely incorrect and the government does not even make that argument anymore. The government is not making that argument. That was in the indictment and it was false. False. In the indictment. False when the government first said it in opening. Mr. Kluh, even if we assume with you that your client was not obliged to answer information about ownership and that the disclosure of that information was wholly gratuitous, would it still not be relevant to Medicare that if you answered the question and answered the question falsely and said Susan Alexander, date of birth, 8-22-1948, supplier billing number, telephone number, social security number, et cetera, was in fact false? That she did not own it, that two other folks owned it, her son, Dr. Alexander, and this fellow Waxman were the true owners? Wasn't that information most material and couldn't it have reasonably affected the decision-making process by Medicare? Absolutely. It could not have affected the decision-making process. Why not? Because it's effectively excised from the Medicare review. In other words, the government now, I don't even think the government is making the argument that there was any impact of the... There doesn't have to be an impact. Of any potential impact. In other words... Theoretically, Medicare does not have to know that it's false or not. If you make a knowingly false statement and it is material and you make it gratuitously, why isn't that sufficient? Well, that is a different type of materiality. The court distinguishes... I'm asking you that specific question. I understand. And that is not this kind of materiality. This jury was instructed if this form, this statement can only be material, if it had a reasonable possibility of affecting an enrollment application decision by the person, and there was no possibility of that occurring. There was no enrollment application decision being made. It was not being reviewed... Let me ask you a question this way. Let's suppose you falsely disgorge that Susan Alexander owns this company that's billing a lot of bucks to Medicare and in truth and in fact two other people own it. And you say right on the form, yeah, we falsely disgorge that information. In fact, she wasn't the true owner. She was a straw person and the true owners were X, Y, and Z. But with regard to hours, which is what we're really talking about, we think that's irrelevant. You mean Medicare would have to ignore that statement and could not ab initio just say, thank you, we're cutting you off. We're not going to do business with you anymore because you falsely disgorged who owned the company. Does that suddenly become irrelevant to a decision maker who admittedly was getting information about enrollment and numbers in hours? Confession to a crime clearly would have been relevant. It still wouldn't have met the materiality standard under there. Why? Well, for two reasons why. First, the form says the form tells people do not update anything other than what you're changing. Other than what you're telling us you're changing. It says so. It's Government Exhibit 108 at page four at the top. Instructions for completing this application. Do not update. So it's telling you cannot have a more direct statement. There has never been a case ever even prosecuted. So it's your argument that they submit false information on the 2016 form. They are forever free to continue to submit false statements for reimbursement. They could have prosecuted any number of other things. That's not my question. The question is, they submit false statements in 2016. If I'm understanding your argument correctly, they are then forever free to continue to submit false statements for reimbursement. There is no false claims for reimbursement in this case, first of all. So let me just make that clear. We're not stopping the government from prosecuting immaterial, extraneous things on a form that is not called for. Because that's what the law requires. That's why the word is in there. Doesn't the statement tell you that if you submit false information, you could be prosecuted? You could be required to pay back what you received? Doesn't it tell you that on that 855-S form? Again, yes. But again, the District Court, the Supreme Court in Gallatin says there are two questions for this Court. What was the decision being made and what was the reasonable likelihood that this statement would have affected that decision? There's no question about what the answers are. But this relates back also to the aiding and abetting. Once you have no knowledge at all that the defendant has seen this extraneous statement, no knowledge at all. Where did Waxman get the name Susan Alexander and all of the identifying information, including her fingerprints, her address, her phone number, and her Social Security number? It was public record. What's the testimony in this case, Mr. Kluh? Isn't the testimony from Mr. Waxman, the co-conspirator? I got all this information from your client. He gave it to me to enable us to conceal the true ownership. Why wouldn't that constitute aiding, abetting, counseling, inducing, or procuring the crime? Three years prior, some information regarding Susan Alexander was provided by my client. Three years prior. From that time until three years later, there is no document signed by Susan Alexander or purported to be signed. This document wasn't signed by Susan Alexander and Mr. Waxman doesn't know who signed it. Three years later, a document is signed by somebody and is submitted and it has a statement in there that doesn't belong in there, that Medicare doesn't apply, doesn't rely on in any way. What does the record reflect with regard to whose idea it was to use Susan Alexander as a fake owner? Where did they get her fingerprints, her Social Security number, her personal information, and her signature? What does the record reflect with regard to where they got all of that? The record reflects that the reason why Mr. Waxman's name was on there. It's not so much why her name was on there, but why Mr. Waxman's name was not or why Dr. Alexander's name was not. Yeah, but all that information, where does the record reflect where they got that from? In 2016, that was a decision in 2016 by Dr. Alexander, but that has... They got it from Lawrence Alexander. Yes, but aiding and abetting requires knowledge that a crime either is being committed, was committed, or is going to be committed. It requires knowledge. Mr. Waxman did not even have knowledge. Wasn't there a testimony in this case, and just help me with the record for a moment, wasn't there testimony in the record from Waxman that one, he got the name from your client, and two, your client told him to scribble the name or the initials of Susan Alexander on it, that it was your client who authorized him or encouraged him or procured him to actually falsely sign the form as being Susan Alexander when in fact Waxman wasn't? But didn't that happen because your client authorized him to do it? At least isn't that the testimony from Waxman? That's the testimony from Waxman that occurred in 2016. Waxman's had no recollection whatsoever and there was no such scribble on this document. This document did not fit any pattern whatsoever. The government argues that there was a pattern. Is there a signature on this document? There's a signature on the document, but there's not what the court referred to in terms of the conversation by Mr. Waxman. Mr. Waxman said in 2016 in order to start the thing going, again, Ms. Alexander had to go to the police department, she had to give her fingerprints, she had to participate in this process, and she was fully on board. It is her company. It's always been her company before this, after this. Susan Silent Hill, she's a registered owner. So your argument is that she really is the true owner of the company based on this record? Nobody disputes she's an owner of Silent Hill LLC. She's always been an owner of Silent Hill LLC. Always. If that's the case, when Mr. Waxman drew the money out of the bank, why did he give half to the doctor and then give Susan Waxman any of the money? Again, falsity is not materiality. And this court has held that line until today. We're in 2025. This court has always held that line. If it's not something that was reasonably, reasonably capable of influencing the person looking at whether these hours fit or not, the Medicare guidelines, it's not material. With that, counsel, we'll ask you to bring your remarks to a close. You're over your time, or otherwise you're free to eat into your rebuttal, which is five minutes. Simply, if I could, Your Honor, just state that to build an aiding and abetting case without evidence of knowledge of the false statement, even being in the form, is impossible. Thank you very much. Mr. Lange. Thank you. Good morning, Your Honors, and may it please the Court. Andrew Lange for the United States. The evidence at Alexander's trial proved that he aided and abetted the submission of a materially false statement to Medicare from the Southern District of Florida, and his related challenges to the sufficiency and the indictment are meritless. I'm happy to jump straight into the materiality argument. The evidence at trial, including, as Your Honor pointed out, expert witness Stephen Kendoza's testimony, established that this false statement about the true ownership of a durable medical equipment company that was signing up to continue its billing relationship with Medicare was material. Medicare, in a word, cared about knowing who the true owners of DME companies were when they signed up to start their billing relationships with Medicare and on an ongoing basis. Mr. Kendoza testified that Medicare needed to know that information because certain owners of these companies could render the companies entirely ineligible to bill Medicare, and he testified, as Your Honors pointed out, that if Medicare discovered that it had been lied to, as it was being lied to continuously in this case, it could take steps including revoking a DME company's billing privileges, clawing back previously paid or overpaid claims, and referring the company to law enforcement. I'll ask you a question. It was established that Mr. Waxman had a right to sign the paperwork. He would call up the doctor each time and get the doctor's permission. The last time he testified he said that Mr. Waxman's testimony was not quite to the point to get him the benefit of the doubt. He went back and forth. I can't remember whether I signed the last one or not. Someone else signed it. I can't remember whether I contacted the doctor. That concerns me, that he really just never said, yes, I followed the normal procedure. I called the doctor up. He gave me permission to sign his mother's name. I signed the mother's name. I submitted the form. The name is signed in the section of ownership, but he wavered. I agree with that, Your Honor, and I agree that in this case there wasn't direct evidence in the form of specific recollection from Mr. Waxman about this particular form, how it was signed or submitted. However, there was unequivocal circumstantial evidence, including when Waxman was crossed about exactly this issue, which was in front of the jury and which the jury rejected, that he always followed the same regular practice in terms of how and where these forms were submitted. He testified at page 286 of docket number 399 that he never signed or submitted anything without Alexander's consent. I agree there was some debate, including especially on Cross, about who exactly signed Ms. Alexander's name on this particular form. I think the defense theory from my colleague's co-counsel was that Waxman himself had actually signed Susan Alexander's name on this form. Is that based on prior procedure? Are we supposed to say, based on all the prior procedure, a juror could say Waxman signed the last one as well? I think the jury was entitled to rely on the circumstantial evidence here. In particular, on Cross examination, at page 288 of docket 399, defense counsel asked Waxman if he was faking signatures because the theory, I believe, on Cross was that Waxman was the one who was doing it on this specific form but not usually. Waxman responded, quote, never without the direction of Dr. Alexander, not once. With respect to aiding and abetting, I think that circumstantial evidence was more than enough for the jury to rely on in concluding that in this particular case, even though Waxman didn't have a specific recollection of this form three or four years after it was submitted, they could rely on the testimony of regular practice. Continuing on the subject of materiality, in addition to Kendoza's testimony, of course, as your honors pointed out, there's language from the form itself. I want to slightly amend Mr. Clue's quotation of page 4 of Government Exhibit 108. Although it may be true that ownership information when the form is used to update other enrollment information is not required, the form tells the filer any field marked as optional is not required. However, it is highly recommended that if reported, these fields be kept up to date. And perhaps more importantly on page 2, the form tells filers in order to obtain and retain their billing privileges, filers must disclose any person having ownership, financial, or control interest in the supplier. Where would I find that on page 2? We're looking now at the Medicare enrollment application, right? Yes, exactly. The second page is captioned DMEPOS Supplier Standards for Medicare Enrollment. There are 30 points on that. Which one are we talking about? Indeed there are. So the obtain and retain language is just below the header. DMEPOS supplier must meet in order to obtain and retain their billing privileges. And then the ownership provision is number 17 in the right-hand column. A supplier must disclose any person having ownership, financial, or control interest in the supplier. And the evidence here showed that that disclosure on this form was false. Additionally, as your honors have already pointed out, we have testimony from Waxman himself, which established that not only did Medicare care about accurate ownership information, but Waxman and Alexander well understood that Medicare cared. Waxman explained the reason that he wanted to lie about the true owners of Silent Hill was because he was worried that Medicare might discover that he had ownership interests in multiple DME companies that were billing Medicare at the same time. Medicare might have a problem with that. They might be suspicious. They might start conducting what he called prepayment audits. And then when he discussed this issue with Alexander and raised the possibility that an owner might have to provide a personal financial guarantee. Mr. Lang, his argument is, or at least one of them, is that even assuming arguendo that the statement was false about ownership and Susan Alexander, it wasn't material, it wasn't relevant to this issue because this form, which was filed in 2019, was designed and intended to accomplish a different purpose. At this point, they weren't looking to the ownership issue. They were looking to what? Hours, et cetera, et cetera, et cetera. And that therefore, even assuming it was filed falsely, it was not only gratuitous, it was irrelevant to the purpose for which this form was filed. And he says, your problem is you got to it too late because 2016, well, that was relevant on the front end for whether they would indeed do business with this company, but that's time barred. And you can't back your way into it with a document that had nothing to do with that. What's your answer to that? If it's gratuitously false but not relevant to the purpose for which this form was filed, can it be material as a matter of law? Tell me why. I think the central problem with that argument is that it's effectively an attempt to graft an additional element onto Section 1035 liability, which is, in so many words, a required materially false statement. But there's no support for that in the text of Section 1035 or in any case law of which the government is aware. And indeed, this court's Section 1001 precedent in United States v. Diaz is a significant obstacle to this argument because in Diaz, this court acknowledged in rejecting a virtually identical argument, it is no defense to false statement liability that the false statement was not required to be made. And I think in response to Your Honor's concern, Judge Jones, effectively Alexander's argument would immunize all false statements except the first one. And a defendant in Alexander's position would be allowed to continue lying to Medicare about a subject that the evidence is overwhelmingly clear Medicare cared very deeply about in perpetuity. So there's simply no requirement in the statute that the government prove that a false statement was made in response to a request or a reporting requirement. All the statement has to be is materially false in the sense that it was capable of influencing or had a natural tendency to influence a decision of the decision maker. And here the evidence showed exactly that. I wonder if we could move to a sentencing issue. Please. Counsel says restitution was not proper in this case. Where do I find in the record what the actual losses were that Medicare incurred or sustained because of the false statement in the 2019, January 2019 form? So I believe some of this happened sort of in the moment during the restitution hearing. There was some dispute about when the clock should start for using Medicare claims after the submission of the false statement in January 2019. And as the restitution and forfeiture hearing transcript reflects, counsel for the government and the defendant sort of put their heads together over a laptop and ultimately decided we'll start two weeks after the false statement was submitted sort of as a grace period I suppose before starting to calculate claims. So that's how the number was arrived at. And significantly I don't understand my colleague to be objecting to the calculation of the restitution amount. Rather I understand his argument to be that essentially restitution should be zero because the false statement didn't cause loss. And we disagree very strongly with that premise because as the district court reasonably found, the false statement about ownership essentially enabled Silent Hill to continue billing. That was the theory of the government's case from the get-go. The government made that argument to the jury in its opening and closing statements. And the district court correctly accepted that logic during the restitution hearing. So that's the essential basis for the amount of restitution, which again I don't understand my colleague to really be objecting to. I'm also of course happy to talk at greater length about the aiding and abetting question. I think the evidence was very clear, really essentially from Waxman's testimony that Alexander knew from the inception of this plan that the idea was that he would use his mother's identifying information. He was the source of that identifying information. According to Waxman... Was there any evidence of what would have happened if Waxman's name had been disclosed as an owner? I don't believe there was specific evidence of exactly what steps Medicare would have taken. I don't believe anyone was posed that specific counterfactual... No, no, but what was there in this record about Waxman's concern or problem? What was there in his history that would have led him to conceal his ownership? As Waxman testified at trial, his concern was, I have my fingers in too many pies. I own too many DME companies and he was concerned that that would make Medicare suspicious. So at least at the inception of this plan in 2016, that was his belief, why it would be helpful for them to list essentially an innocent straw owner on the paperwork. Is there any other reason? I believe that was his testimony, at least in terms of when the plan began. What about Alexander? He had nothing in his record, however, that would have caused anyone to have a problem, right? He was a well-respected surgeon. I suppose that's true. It's possible he might have been able to list himself, but... I mean, there's no evidence in any event that there was anything in his record that would have been a red flag for Medicare when the forms were disgorged and the ownership was listed. I believe that's correct, at least according to Waxman's testimony, although it is worth noting that Waxman testified when he suggested the problem of a personal financial guarantee that an owner would have to stand behind. That was what prompted Alexander to suggest using his mother, because in his words, her credit is already bad anyway. So Alexander certainly didn't want to appear on the forms, notwithstanding what actual red flags that might or might not have raised for Medicare. And with respect to aiding and abetting, I think the evidence was clear at trial that Alexander knew that that was the plan. He was the source of, as Your Honor pointed out, his mother's identifying information. And as Waxman testified, in terms of his habit or routine, he always ran these forms by Alexander before submitting them. And of course, with respect to venue, that process always happened from Waxman's office, which was in the Southern District of Florida. I'm happy, of course, to answer additional questions about these issues or touch on the jury instructions, with respect to which we think there are insurmountable procedural hurdles. I have one question on the jury instructions. Deliberate indifference charge instructions given by the judge, was that based on what? I saw two possibilities that Dr. Alexander did not want to know about the day-to-day operations, or he didn't want to know about what Mr. Waxman was doing. What was that really based on? Deliberate ignorance? Sure. So I think from the record, it's fair to say that most of the focus during the discussion of the deliberate ignorance instruction and the two defendants' objections was on Zuzmur. So Zuzmur had a more fulsome objection. He had already testified by that point. And as we explain in our brief, really all the argumentation in Zuzmur's brief is about Zuzmur. His testimony, the fact that he distanced himself from Waxman, things like that. So I think it's fair to say most of the focus was on Zuzmur. As we explain in our brief, I think there are three different reasons why this court should affirm. The first of which is improper adoption of the argument from Zuzmur's brief. But also there was evidence that Alexander had become distanced from Silent Hill over time. And then finally, of course, as this court has held, if there was sufficient evidence of actual knowledge, the improper delivery of a deliberate ignorance instruction is harmless error, as it was in this case. When was the first time this issue raised on appeal? Was it in the reply brief? I believe this issue was raised in Zuzmur's opening brief. It was raised in the opening brief? Yes, exactly. So Zuzmur, in terms of the chronology, Zuzmur filed his opening brief. Then the appeals were consolidated, so the schedule was saved. We didn't file our answering brief at that point. So the issue's not waived? We believe it's improperly adopted. So Zuzmur, his appeal, of course, has since been dismissed. And like a sufficiency of the evidence argument, which is really personal to a particular appellant, it's our view that Zuzmur's argument is really specific to him and his circumstances. But Alexander bootstrapped his argument and adopted it, right? He attempted to do so. In our view, he did so improperly by failing to explain how the argument, if at all, applied to him. Zuzmur's argument in Zuzmur's opening brief is exclusively about Zuzmur. It doesn't even use Alexander's name. Right, but when the judge gave the deliberate indifference instruction, did the judge say this only relates to Zuzmur and has nothing to do with Alexander? No. Was it limited in that way? It was not. It was a general instruction. General instruction. Yes, that's correct. Did counsel for Alexander, this would have been trial counsel, ask for such a limiting instruction? I don't believe he asked for a limiting instruction. That is to say, judge, there's no issue of deliberate indifference as far as my client is concerned. Tell him if you want, if Zuzmur is another story, but make sure you limit this. He did object to the instruction. I don't believe he specifically made the request that Your Honor is describing, but in any event, I think the problem on appeal is the adoption of the argument from Zuzmur's brief because Zuzmur's argument is only about the inappropriateness of the instruction with respect to him. But setting that issue aside, I think on the merits, even assuming this argument is before the court, Alexander has failed to show that there wasn't a basis for a deliberate ignorance instruction as to him specifically. What was the basis? As to Alexander in particular? As to Alexander in particular, there was evidence from Waxman's testimony at page 178 of docket 398 that he became less involved in the business over time. And I think the analogy to the Seventh Circuit case Williams, which we cite in our brief, is a fairly good one where there a fraud defendant had said, don't bother me with daily reports going forward. And the Seventh Circuit held that that was enough to support a deliberate ignorance instruction. So there was some evidence that Alexander had distanced himself from the business over time. He wasn't involved in the day-to-day. But again, I think perhaps the easier off-ramp here is a holding that even if the instruction was inappropriately given as to Alexander, there was sufficient evidence of actual knowledge. And under those circumstances, any error in giving a deliberate ignorance instruction is harmless. So if I could just go back to restitution just for one minute before you sit down. The parties stipulated that Medicare had never actually reviewed the 2019 form because the contractors never acted on it. So the parties stipulated a number of things in advance of sentencing. One of the stipulations was Medicare contractors review everything that is submitted on the 855S forms. If there are no other questions, we ask the Court to affirm. Thanks very much. Louie, you have reserved five minutes. Thank you, Your Honor. There was a reference to if you include optional information, make sure it's updated. We are not talking about optional information in this case, and that's Government 108-4, page 4. That instruction, which says don't even update optional information, we go beyond that. Ours information was not optional. Our information was functionally excluded. In other words, Medicare is telling you we are not going to pay attention to this. The Government's theory is that such they're not disputing that Medicare is telling the truth because they stipulated to it after trial. After trial, they said, yeah, we look at it. They read the whole form, but they base their decision on what they are interested in, which is the hours. And the only things that could have happened on this form was no possibility of granting or denying provider status. That was not an issue. The only thing that could have happened on this form is either say, yes, we think you should go back to your old hours, or no, these hours are fine. This was not an application for enrollment. That's why it wasn't even optional. And even as the optional information that says don't update, even as the optional information, it could not be much less material. But let's go to the other question. The Government says there was actual knowledge. In what possibility? Waxman didn't even have actual knowledge. Waxman didn't even know what the form was. The Government had gone through half the trial without explaining to the jury that this was not actually an enrollment application. We're halfway through the trial, and Waxman is finally confronted with, isn't this like an hours change thing? And he looks at it and says, oh, well, that's possible. Maybe that's what it was. And why is that? Because there weren't some kind of series of typical routine practices. There had been nothing filed for three years. There was the application in January 16, apparently signed with consent of Ms. Alexander and Mr. Alexander. And then three years later, three years later, there's this form. That's not a typical practice. And that's certainly not any evidence of actual knowledge. This Court has been so clear, so clear, that the knowledge in aiding and abetting on a false statement has to be, not that a statement was made. We cited multiple cases, the Robeson case, for example. The knowledge has to be that the false statement was included. In other words, he had to have knowledge that this gratuitous statement that Medicare is not just saying, you can put it in if you want to. Medicare is saying, don't put it in. We're not going to pay attention to it. How was there any evidence that he had actual knowledge of that? And if there's not, then what is the good of the law of this Court that says you have to have actual knowledge of the false statement? Not in 2016, but in 2019, three years later. There was no evidence in this case that Waxman even knew that the hours had changed. No evidence he had any involvement in this document whatsoever. He came up with one idea, well maybe it's this signature, maybe it's that. This is not a case of a guilty person in relation to a false statement. This is a case of an innocent person. And I know this Court doesn't care that he passed two polygraphs. I know. But I know that he passed two polygraphs. It sounds like a good argument to be made to the jury, but the jury didn't buy it. Well, you can't talk about polygraphs and we moved where we couldn't talk about it. But the point is there's no evidence of actual knowledge. And when the government comes forward, what evidence did they tell you about actual knowledge? What evidence did they tell you that he had knowledge that some gratuitous statement. I'm just curious about something that you just said. He was polygraphed twice, passed it. Did you offer that as evidence in this case and the judge said no, you can't put it in? Yes, and he didn't rule on it until after the government had arrested. You didn't raise that as an issue on appeal, did you? I'm just asking a simple question. Either you did or you didn't. I can't win the issue, but it affects my emotions if I'm too emotional. It affects my emotions and it affects the seriousness of my arguments. I'm telling you the law. This is the law. The law says he's got to know that there was a false statement in that form. And there was no reason on earth for a false statement to be on that form. The law says that false statement has to have a material impact on a decision being made by the administrative agency. And there was no decision in the world that took into account that statement. The later on theory of oh, he should have updated, we've debunked that. It says even as to optional information, don't update. As to everything else, again, halfway through the trial they put on, not their expert, some other witness to finally say no, you don't have to put in all that stuff. That's no way to run it. And they say I'm grafting on a requirement of redaction. It's a requirement of the ownership form. I'm grafting that on. It's in the indictment. It's why the district court denied my motion to dismiss the indictment. I'm not grafting something that's written into the indictment. I beg this court. This man had a perfect record. He is a fantastic spinal surgeon. Please, in this one case, I ask the court, the law supports it. The facts support it. The arguments are untenable by the government. Please.